## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

AARON J. FULTON,

      Plaintiff/Counter-Defendant,

v.

HONKAMP KRUEGER FINANCIAL
SERVICES, INC.,

      Defendant/Counter-Claimant/
      Cross-Claimant,

v.

MARINER, LLC, d/b/a Mariner Wealth
Advisors,

      Cross-Defendant.

Case No. 20-CV-1063 (PJS/DTS)

ORDER

---

Katie M. Connolly, Andrew Peterson, and Joel D. O'Malley, NILAN
JOHNSON LEWIS PA, for Aaron J. Fulton and Mariner, LLC.

Jeremy D. Sosna, Benjamin D. Sandahl, and Michael R. Link, LITTLER
MENDELSON P.C., and Todd L. Stevenson, KANE, NORBY & REDDICK,
P.C., for Honkamp Krueger Financial Services, Inc.

Aaron Fulton is a former employee of Honkamp Krueger Financial Services, Inc.

("HKFS"). On May 1, 2020, Fulton terminated his employment with HKFS and

immediately went to work for Mariner, LLC, a competitor of HKFS. Fulton then filed

this lawsuit against HKFS, seeking a declaration that the restrictive covenants in his

employment agreement with HKFS are unenforceable. HKFS counterclaimed alleging

breach of contract and misappropriation of trade secrets, and also filed separate

lawsuits against Fulton (in Iowa[1]) and Mariner (in this Court[2]).

This matter is before the Court on two motions for a preliminary injunction filed

by HKFS—one filed in the lawsuit that Fulton brought against HKFS, and the other

filed in the lawsuit that HKFS brought against Mariner.  After the Court heard oral

argument on these motions, the two cases were consolidated, and the Court therefore

addresses both motions in this order.  For the reasons that follow, HKFS's motions are

denied.

## I.  BACKGROUND

Fulton began working for HKFS as a Senior Financial Advisor in December 2011,

and he was eventually promoted to non-equity partner and vice president.  ECF No. 51

¶¶ 9, 11.  HKFS is a financial advisory firm that relies heavily on referrals from CPA

firms to bring in new clients.  As HKFS explains, the firm "provides financial advice

and wealth management services to CPA firm clients and then shares revenues

generated from that work with . . . the CPA firms."  *Id.* ¶ 4.

At the time that he was hired in 2011, Fulton entered into an employment

agreement with HKFS containing non-compete, non-solicitation, and confidentiality

---

[1]*Honkamp Krueger Fin. Servs., Inc. v. Fulton*, No. 2:20-CV-1018 (LTS/KEM) (N.D.
Iowa filed May 7, 2020).

[2]*Honkamp Krueger Fin. Servs., Inc. v. Mariner, LLC*, No. 20-CV-1138 (PJS/DTS)
(D. Minn. filed May 11, 2020).

provisions.  *See* ECF No. 1-1.  Fulton also executed an employee proprietary information agreement, in which he agreed "not to disclose, or make any use of" HKFS's confidential information, except as specifically authorized.  ECF No. 45-2 at 2.  Both contracts are governed by Iowa law.

Fulton began looking for a new job in January 2020, after he learned that HKFS was in the process of being acquired by a publicly-traded company.  ECF No. 62 ¶¶ 6–12.  Fulton received an offer of employment from Mariner in April 2020.  *Id.* ¶ 14. Mariner and HKFS are direct competitors; like HKFS, Mariner is a financial advisory firm that relies heavily on referrals from CPA firms.

Fulton and Mariner were aware of the restrictive covenants in Fulton's contracts with HKFS and, with the help of counsel, they executed a carefully orchestrated scheme to terminate Fulton's employment with HKFS in a manner that was intended to avoid triggering the non-compete clause.  The key to the plan was the realization that Fulton's employment agreement distinguished between the termination of the *employment agreement* and the termination of his *employment*.  In other words, the agreement permitted Fulton to terminate the employment agreement and yet remain employed by HKFS.  Fulton and Mariner also realized that nothing in the non-compete clause provided that it survived the termination of the employment agreement.  This created a loophole:  If Fulton first terminated the employment agreement and then later

terminated his employment, the non-compete clause would not apply, because the

agreement would not be in effect at the time that Fulton quit his job.

Fulton exploited this loophole on May 1, 2020.  At 2:37 pm, Fulton sent an email

to John Darrah, HKFS's CEO, terminating his employment agreement.  *See* ECF No. 51-1

at 11.  Two minutes later (that is, at 2:39 pm), Fulton sent a second email to Darrah

terminating his employment.  *See id.* at 20–23.  The resignation letter attached to Fulton's

2:39 pm email explained that he was going to work for Mariner and that he had

deposited all documents belonging to HKFS in a locked filing cabinet in HKFS's office.

*Id.* at 22.  Fulton also explained that he had hired a third-party forensics expert to ensure

that all confidential information had been removed from his personal devices.  Later

that same afternoon, Fulton filed this lawsuit seeking a declaration that the restrictive

covenants in his employment agreement with HKFS are unenforceable.

According to HKFS, three of its clients followed Fulton to Mariner, and Fulton

has contacted at least one CPA firm with whom HKFS has a referral relationship.  ECF

No. 26 ¶ 15; ECF No. 27.  Based on these facts, HKFS alleges that Fulton has violated the

terms of both the employment agreement and the employee proprietary information

agreement and that he has misappropriated trade secrets in violation of Iowa's Uniform

Trade Secrets Act.[3]  HKFS further alleges that Mariner is liable for tortious interference

---

[3]HKFS asserts that its trade-secrets claim is governed by Iowa law, and Fulton
has not argued otherwise.

with contractual relations.  HKFS seeks preliminary injunctions to enjoin both Fulton

and Mariner from further illegal acts.

## II.  ANALYSIS

### A.  Standard of Review

A litigant seeking a preliminary injunction under Fed. R. Civ. P. 65 "must

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable

harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008); *see also Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.

1981) (en banc).  "'[A] preliminary injunction is an extraordinary remedy,' and '[t]he

party seeking injunctive relief bears the burden of proving' that these factors weigh in

its favor."  *Mgmt. Registry, Inc. v. A.W. Cos.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (quoting

*Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

### B.  Likelihood of Success

#### 1.  Non-Compete Clause

HKFS alleges that Fulton breached the covenant not to compete in his

employment agreement when he started working for Mariner.  The non-compete

provides that:

> **b.  Covenant Not to Compete.**  Employee further
> covenants that for a period of one year following the
> termination of Employee's employment for whatever reason,

> Employee will not, within the Company's market area,
> directly or indirectly, either as a sole proprietor, partner,
> stockholder, director, officer, employee, consultant or in any
> other capacity, conduct or engage in, or be interested in or
> associated with, any person or entity which engages in the
> "Business" (as defined above), working with CPA firms.  For
> purposes of this Paragraph, the "Company's market area"
> includes, but is not limited to, any state in which HKFS has
> conducted business at any time in the preceding twelve
> months.

ECF No. 1-1 ¶ 8(b).  Fulton argues that he has not breached this provision because

(1) the employment agreement was terminated two minutes before he resigned; (2) the

non-compete did not survive the termination of the agreement; and thus (3) at the time

that he resigned, the non-compete no longer applied to him.

"Non-compete agreements are generally disfavored in Iowa because they 'are

viewed as restraints of trade which limit an employee's freedom of movement among

employment opportunities . . . .'"  *Ag Spectrum Co. v. Elder*, 191 F. Supp. 3d 966, 971 (S.D.

Iowa 2016) (quoting *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa

1999)), *aff'd*, 865 F.3d 1088 (8th Cir. 2017).  Because non-competes are disfavored under

Iowa law, "they are strictly construed against the one seeking to restrain another from

pursuing his profession, business or employment."  *Blackman v. Folsom*, 200 N.W.2d 542,

542–43 (Iowa 1972).[4]

---

[4] *See also Cogley Clinic v. Martini*, 112 N.W.2d 678, 681 (Iowa 1962) ("Restrictive
covenants of employment are strictly construed against one seeking injunctive relief.");
*Mut. Loan Co. v. Pierce*, 65 N.W.2d 405, 407 (Iowa 1954) ("The agreement not to engage
(continued...)

This is a problem for HKFS because Fulton's employment agreement is very

poorly drafted.  The agreement appears to be stitched together from parts of other

employment agreements, with little thought given to how the parts work together.  It

also contains multiple grammatical, typographical, and other errors.  And the non-

compete itself is so broad and ambiguous that it may be unenforceable.  The Court need

not address the enforceability of the non-compete, however, as the Court agrees with

Fulton that he managed to avoid its application.

As Fulton argues, nothing in the employment agreement provides that the term

of the agreement is synonymous with the term of employment.  To the contrary,

paragraph two of the agreement provides:  "Employment is at will; however the parties

agree that either party may terminate the Agreement on written notice."  ECF No. 1-1

---

[4](...continued)
in a competing business on leaving employment is an agreement in restraint of trade,
and . . . is to be strictly construed[.]"); *Cedar Valley Med. Specialists, PC v. Wright*, 940
N.W.2d 442 (Iowa Ct. App. 2019) (unpublished table decision) ("Because restrictive
covenants involve the partial restraint of trade, we construe them against the party
seeking enforcement and approve them with some reluctance."); *Bd. of Regents v.
Warren*, 760 N.W.2d 209 (Iowa Ct. App. 2008) (unpublished table decision)
("Non-compete agreements, otherwise known as covenants not to compete, are not
generally favored, however, because they are viewed as restraints of trade which limit
an employee's freedom of movement among employment opportunities.  A restrictive
covenant is strictly construed against the party seeking injunctive relief." (internal
citation, quotation marks, and alterations omitted)); *Farm Bureau Mut. Ins. Co. v. Osby*,
707 N.W.2d 338 (Iowa Ct. App. 2005) (unpublished table decision) ("[B]ecause the
clause restrains trade we must strictly and narrowly confine its application to the
conduct explicitly restricted.").

¶ 2.  This language strongly suggests that the term of the agreement is distinct from the term of employment.

The first clause—"[e]mployment is at will"—speaks to the term of *employment*. At-will employment "means the employment relationship is terminable by either party at any time, for any reason, or no reason at all." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (citation and quotation marks omitted).

The second clause—"however the parties agree that either party may terminate the Agreement on written notice"—speaks to the term of the *agreement*.  The subject of the second clause ("the Agreement") is not the same as the subject of the first clause ("Employment").  If the two clauses were addressing the same subject, then presumably they would use the same word.  That the two clauses are addressing different subjects is also suggested by the word "however."  The first clause essentially says that there are no restrictions applicable to the termination of *employment*.  "However," says the second clause, there is a restriction applicable to the termination of the *agreement*:  A party who wishes to terminate the agreement must provide written notice.[5]

_____

[5]HKFS argues that the term of employment and term of the agreement are the same, and that paragraph two was intended to modify Fulton's at-will employment by requiring that a party seeking to terminate that employment must give written notice to the other party.  At oral argument, counsel for HKFS suggested that the purpose of the second clause of paragraph two would be clearer if it had said: "however the parties agree that either party may terminate the employment relationship only on written notice."  Unfortunately for HKFS, however, that is not the language that the parties used, and the Court must interpret the contract as it was written, and not as HKFS

(continued...)

Paragraph two may simply reflect the poor drafting that plagues the employment agreement;[6] after all, HKFS uses the terms "Agreement" and "employment" throughout the employment agreement, and often there is no apparent reason for the choice of one term over the other—suggesting that HKFS intended to use the two terms interchangeably. But there is some logic to the distinction that paragraph two makes. Paragraph two says in essence: "Your employment is at will, and thus either of us can terminate it at any time and for any reason. However, while your employment continues, the agreement will apply, unless one of us has terminated it in writing." It does not make much sense to apply the written-notice requirement to at-will employment. If Fulton decided to quit without giving written notice—by, for example, saying "I quit" to his supervisor—what remedy would HKFS have? Seeking

---

[5](...continued)
wishes it had been written.

[6]As noted, the employment agreement is poorly drafted, and some of its provisions make no sense. To cite just one of multiple examples: Paragraph ten of the agreement—entitled "Termination"—provides: "Section 2 hereof notwithstanding, Employer may immediately terminate this Agreement if 1) the Employee engages in theft or fraud in the conduct of Employer's business or commits any act which constitutes a felony; or 2) Employee is insubordinate to Employer." ECF No. 1-1 ¶ 10.

It is difficult to discern the purpose of this provision. Under paragraph two, HKFS already had the right to terminate Fulton's employment for any reason or for no reason, as well as the right to terminate Fulton's employment agreement simply by providing written notice. Paragraph ten appears to accomplish nothing except to give HKFS the right to terminate Fulton's agreement without providing written notice if Fulton engages in theft or fraud or acts insubordinately.

an injunction to force Fulton to write "I quit" on a piece of paper? It does, however, make sense to make the parties be clear with one another about the terms that apply to Fulton's continued employment.

It is also not absurd to think that Fulton might terminate the agreement but not his employment. After all, most employees do not work pursuant to written employment agreements, and the bulk of Fulton's agreement is devoted to imposing restrictive covenants on him. Fulton's agreement did not even guarantee Fulton a specific amount of compensation. It just said that "[i]n addition to the compensation as agreed," Fulton would be entitled to certain benefits, such as the right to participate in Honkamp's health insurance and retirement plans. ECF No. 1-1 at 2 ¶ 3. The agreement also does not describe Fulton's job duties, except to say that he "is engaged as a Senior Financial Advisor. Please review job description." *Id.* at 2 ¶ 4. Presumably, then, if Fulton continued working after the agreement was terminated, his compensation and duties would be governed by the same agreements (written or oral) that previously existed outside of the (terminated) employment agreement.

For these reasons, the Court agrees with Fulton that paragraph two of his employment agreement distinguishes between the termination of the agreement and the termination of his employment. Even if paragraph two does not clearly make that distinction, it is at least ambiguous on the issue—and, because a non-compete must be

strictly construed against the former employer under Iowa law, paragraph two must be strictly construed against HKFS.

The distinction between the termination of the agreement and the termination of employment is critical because the non-compete does not survive the termination of the agreement.  Under Iowa law, a restrictive covenant does not survive the termination of an employment agreement absent some indication that the covenant is intended to do so.  *See Fin. Mktg Servs., Inc. v. Hawkeye Bank & Tr. of Des Moines*, 588 N.W.2d 450, 457 (Iowa 1999) ("the non-compete provision does not apply, by its own terms, to sales made after the contract has terminated").  Many—perhaps most—restrictive covenants expressly provide that they survive the termination of the agreements in which they appear.  Fulton's own employment agreement expressly provides that some restrictions survive the termination of the agreement.  For example, the confidentiality clause prohibits Fulton from disclosing confidential information "[d]uring the term of this Agreement *and after*."  ECF No. 1-1 ¶ 7(c) (emphasis added).  But nothing in the agreement provides that the non-compete survives the agreement's termination.  And thus, if Fulton first terminated the agreement, and then terminated his employment, the non-compete would not apply to Fulton at the time that he quit his job.

That is precisely what Fulton did.  At 2:37 pm on May 1, 2020, Fulton terminated his employment agreement by sending an email to Darrah.  *See* ECF No. 51-1 at 11.  At 2:39 pm—when the agreement no longer applied to Fulton (because he had terminated

it two minutes earlier)—Fulton terminated his employment by sending a second email

to Darrah. *Id.* at 20. The Court therefore finds that HKFS cannot establish a likelihood

of success on the merits with respect to its claim that Fulton breached the non-compete

clause in his employment agreement.[7]

### 2. Non-Solicitation Clause

HKFS next argues that Fulton breached the non-solicitation clause of the

employment agreement by soliciting HKFS's clients and referral sources following his

resignation. According to HKFS, three of its clients have already moved their business

to Mariner. ECF No. 26 ¶ 15. HKFS has also submitted the sworn affidavit of Jeffrey

Knapp, the managing partner of Erpelding Voigt & Co., LLP ("Erpelding Voigt"), a

CPA firm that refers clients to HKFS. ECF No. 27. Knapp states that Fulton has

contacted him on several occasions attempting to set up meetings between Erpelding

Voigt and Mariner.

The non-solicitation clause of the employment agreement provides in relevant

part:

> **a. Covenant Not to Solicit.** . . . [I]f this Employment
> Agreement is terminated by either party for any reason,
> [Fulton] agrees not to solicit Business, nor to assist any other
> person in the solicitation of Business, from any Company
> client or prospective client, directly or indirectly, for a period
> of three years from and after the date of termination of

---

[7]Again, the Court has doubts that the non-compete would be enforceable, even if
it did apply to Fulton. But the Court need not reach that issue.

> employment.  Furthermore, during the same three year
> period after termination of employment, [Fulton] will not
> accept any Business from any of the Company's clients or
> prospective clients.

ECF No. 1-1 ¶ 8(a).

Unlike the non-compete clause, the non-solicitation clause survives the termination of the employment agreement.  Whereas the non-compete restriction is triggered by the termination of *employment*, the non-solicitation restriction is triggered by the termination of the *employment agreement*.  Thus, the non-solicitation clause was triggered at 2:37 pm on May 1, 2020, when Fulton terminated the employment agreement.  The period of that restriction was three years, measured from the termination of *employment*—which means that Fulton is forbidden to solicit clients or prospective clients in violation of the clause until 2:39 pm on May 1, 2023.

Fulton nonetheless argues that HKFS is unlikely to succeed on its claim for breach of the non-solicitation clause because the clause is unenforceable.  Under Iowa law, a restrictive covenant is enforceable so long as the restriction (1) is reasonably necessary for the protection of the employer's business; (2) is not unreasonably restrictive of the employee's rights, and (3) is not prejudicial to the public interest.  *Lamp v. Am. Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986).

Fulton first argues that the non-solicitation clause is unreasonable because, although it purports to restrict Fulton from soliciting any "Company client," the term

-13-

"Company" is undefined.  Fulton argues that "Company" must mean something other than HKFS, as HKFS is elsewhere defined in the agreement as "Employer."  This is yet another example of HKFS's sloppy drafting.  But although the agreement could have been drafted more clearly, the Court finds that no reasonable person would interpret "Company" to mean anything other than "HKFS," and thus the agreement is not fatally ambiguous.  *See Iowa Realty Co. v. Jochims*, 503 N.W.2d 385, 386 (Iowa 1993) ("Mere disagreement over the meaning of a word or phrase does not establish ambiguity[.]").

Next, Fulton argues that the non-solicitation clause is unenforceable because it is overbroad.  According to Fulton, the clause, as drafted, prohibits Fulton from soliciting or accepting business from any individual or entity with whom any agent or employee of HKFS did any amount of business—or whom any agent or employee of HKFS solicited in any way—during the year preceding Fulton's resignation, regardless of whether or not Fulton was aware of that business or solicitation.  But under Iowa law, courts do not ask whether, on its face, a restrictive provision is unreasonably overbroad; instead, they ask whether it would be unreasonable to apply the restrictive provision to the specific transactions at issue—here, Fulton's acceptance of business from the three clients who followed him to Mariner.  *See Lamp*, 379 N.W.2d at 910 (explaining that if a restrictive covenant "is void only because it is too broad, a court in the interest of justice should require enforcement of it to the extent that it is not overbroad").  The Court sees no reason why it would be unreasonable to enforce the non-solicitation clause to

-14-

prevent Fulton from doing business with the three clients who followed him to Mariner. After all, Fulton worked directly with those clients when he was still employed by HKFS, and thus he knew very well that they fell within the scope of the non-solicitation clause. *See* ECF No. 51 ¶ 31.

For these reasons, HKFS is likely to succeed in proving that Fulton breached the non-solicitation clause, at least with respect to the three clients who followed him to Mariner.

### 3.  Trade Secrets and Confidential Information

HKFS also alleges that Fulton used trade secrets and confidential information in violation of (1) the confidentiality clause of the employment agreement, (2) the employee proprietary information agreement, and (3) Iowa's Uniform Trade Secrets Act, Iowa Code §§ 550.1–550.8.[8]  HKFS has, however, marshaled very little evidence in support of its allegations.

HKFS does not allege that Fulton retained any confidential or trade-secret information in either hard copy or electronic form.  Nor does HKFS allege that Fulton has disclosed any such information to any outside party.  Rather, HKFS's sole evidence in support of its trade-secret and confidentiality claims is that three of its clients followed Fulton to Mariner, and Fulton contacted Jeffrey Knapp of Erpelding Voigt.

---

[8]The employment agreement prohibits Fulton from using, removing or retaining confidential information "[d]uring the term of this Agreement and after," and therefore survives the termination of the agreement.  ECF No. 1-1 ¶ 7(c).

According to HKFS, the identities and contact information of its clients and referral

sources constitute confidential and trade-secret information.  Fulton could not have

stolen HKFS's clients or contacted Knapp without this information, argues HKFS, so

Fulton must necessarily have used this information in violation of his agreements with

HKFS and in violation of Iowa's Uniform Trade Secrets Act.[9]

The confidentiality clause of the employment agreement is drafted in broad

terms, prohibiting the use of any confidential information including any "records,

───────────────

[9]HKFS asks the Court to further infer that Fulton must have used other
confidential and trade-secret information, such as the amount of fees HKFS charges its
clients, the way HKFS compensates its CPA-firm referral sources, and information
about HKFS's clients' needs, preferences, and business habits.  The Court declines to
draw this inference.  While Fulton *may* have used these additional categories of
information, it is entirely plausible that the three clients decided to follow Fulton to
Mariner for the reason that lots of clients follow lots of service providers when they
change employers:  because the service providers have done a good job and their clients
want to keep working with them.  The fact that three of Fulton's clients followed him to
Mariner provides little reason to believe that Fulton used these additional categories of
HKFS's trade secrets or confidential information.

There also is no evidence that Fulton used these additional categories of trade
secrets or confidential information when he contacted Knapp.  Knapp's affidavit sets
out in detail the dates and subject matter of the calls and voice mails he received from
Fulton in the days following Fulton's resignation from HKFS.  But nowhere in the
affidavit does Knapp recount that Fulton made any reference to his knowledge of
HKFS's pricing, referral fees, or client information.  Knapp does recount that on one call
Fulton stated that "Mariner really puts clients first, and advisors second."  ECF No. 27
¶ 9.  HKFS seizes on this, arguing that by this statement, Fulton "intimated that he will
be able to charge clients less at Mariner than he could at HKFS . . . ."  ECF No. 25 at 31.
That is reading a lot into what appears to the Court to be harmless puffery.  Nothing
about this statement suggests that Fulton attempted to use his knowledge of HKFS's
fees to undercut HKFS.

documentation, data, [or] customer or supplier lists," so long as the information has not become "generally known within [HKFS's] industry."  ECF No. 1-1 ¶ 7(a).  Similarly, under the employee proprietary information agreement, Fulton agreed not to "make any use of except [for] the benefit of the Company . . . any trade secrets, confidential information, knowledge, data, or other information of the Company relating to . . . customer lists . . . or any subject matter pertaining to any business of the Company or any of its clients, licensees, or affiliates[.]"  ECF No. 45-2 ¶ 1.  *See also Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 6–7 (Iowa 2008) (discussing the broad scope of "trade secrets" protected by Iowa's Uniform Trade Secrets Act).

HKFS has not cited any case law holding that the identities and contact information of clients and referral sources, standing alone, are protectable as trade secrets or confidential information.  However, the scope of information protected both by the agreements and by Iowa's Uniform Trade Secrets Act is broad, and for purposes of its preliminary-injunction motion, HKFS need only show that it has a fair chance of prevailing on the merits.  *See Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008) ("*Dataphase* rejected the notion that the party seeking relief must show a greater than fifty per cent likelihood that he will prevail on the merits . . . ." (citation and quotation marks omitted)).  HKFS has satisfied that standard here.

### 4. Tortious Interference

Finally, HKFS alleges that Mariner has interfered with the employment agreement and the employee proprietary information agreement by intentionally procuring Fulton's breach of both agreements. "Under Minnesota law, a claim of tortious interference with contractual relations requires that [the plaintiff] show: '(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.'"[10] *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 664 (8th Cir. 2012) (quoting *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)). Because HKFS is unlikely to establish the fourth element—that Mariner acted without justification—HKFS has not established a likelihood of success on this claim.

A party's procurement of the breach of a contract may be justified if that party acted in reasonable reliance on the advice of counsel. *See Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347 (Minn. 2015). Here, Mariner sought an opinion from attorney V. John Ella about the enforceability of the restrictive covenants in Fulton's employment agreement. *See* ECF No. 61 ¶ 5. Mariner provided Ella with the relevant facts, including a copy of the employment agreement, a description of Fulton's employment with HKFS, and

---

[10]The parties agree that Minnesota law governs HKFS's tortious-interference claim. *See* ECF No. 50 at 18; ECF No. 60 at 19–20.

Fulton's anticipated role at Mariner.  *Id.* ¶ 6.[11]  Ella opined that the restrictive covenants were unenforceable and described the reasons for his conclusion in an eight-page letter. ECF No. 61-1.  Ella is a prominent employment lawyer who is licensed to practice law in both Iowa and Minnesota and who is well known to this Court.  *See* ECF No. 61 ¶ 5.

The Court has reviewed Ella's opinion.  The Court may eventually disagree with some of Ella's conclusions, but Ella appears to have been provided with adequate information, and the conclusions that Ella expresses appear to be well within the range of reasonableness.  The Court is unlikely to find that Mariner acted unreasonably in consulting with Ella or in relying on his advice.  *See Sysdyne Corp.*, 860 N.W.2d at 354 ("[T]he appropriate focus of the justification inquiry is the reasonableness of the defendant's consultation with counsel and reliance on the resulting advice, not the attorney's legal analysis.").  For these reasons, HKFS has not demonstrated a likelihood of success on its tortious-interference claim against Mariner.

In summary, the Court finds that HKFS has not established a likelihood of success on its non-compete claim against Fulton or on its tortious-interference claim against Mariner.  But the Court finds that HKFS has established a likelihood of success on its claims that Fulton breached the non-solicitation and confidentiality clauses of the

---

[11]Mariner failed to provide Ella with a copy of the employee proprietary information agreement, but asserts that this failure is not material because the non-disclosure provisions of that agreement largely mirror the confidentiality provisions of the employment agreement.  The Court agrees.

employment agreement, that Fulton breached the employee proprietary information agreement, and that Fulton misappropriated trade secrets.

### C.   Irreparable Harm

"[A] finding of a likelihood of success on the merits only justifies preliminary relief if there is a risk of irreparable harm and the balance of the factors support an injunction." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation and quotation marks omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc.*, 346 F.3d at 844.

HKFS argues that it faces a threat of irreparable harm because (1) Fulton's actions jeopardize its ability to retain its clients, referral sources, and customer goodwill, (2) the parties contractually stipulated to a finding of irreparable harm upon breach or threatened breach of the restrictive covenants, and (3) under Minnesota law, irreparable harm is inferred from the breach of a valid restrictive covenant.  The Court disagrees

and finds that Fulton cannot establish a threat of irreparable harm sufficient to justify a preliminary injunction.

        1.   Threatened Loss of Clients, Referral Sources, and Goodwill

HKFS asserts that it faces an imminent threat of irreparable harm based on the potential loss of (1) clients, (2) CPA-firm referral sources, and (3) customer goodwill.

First, as to clients:  According to HKFS, three of its clients have already moved their business to Mariner, representing a loss of approximately $4.3 million in assets under management.  ECF No. 26 ¶ 15.  HKFS argues that unless a preliminary injunction is issued, HKFS is likely to lose even more business.

The Eighth Circuit confronted similar facts earlier this year in *MPAY Inc. v. Erie Custom Computer Applications*, *Inc.*, 970 F.3d 1010 (8th Cir. 2020).  MPAY challenged the lower court's finding that it had not established a threat of irreparable harm, arguing that "its lost customers and lost profits are 'impossible to calculate' and thus irreparable[.]"  *Id.* at 1020.  Like HKFS, MPAY submitted evidence that it had lost "three longtime customers," representing about $580,000 in annual business.  The Eighth Circuit affirmed the district court's ruling, noting that "[b]y MPAY's own admission . . . any harm it may suffer in the form of lost customers and lost profits is quantifiable and compensable with money damages accordingly, meaning this harm is not irreparable."  *Id.*

The same is true here.  HKFS has already identified the client accounts and the assets under management that it has lost to Mariner, and acknowledges in its briefing that the fee-based revenue that it would earn from those assets can be calculated.  ECF No. 25 at 17.  There is no reason to believe that HKFS will be unable to calculate its losses in the same manner at trial.

HKFS argues that the threatened economic harm from the loss of clients "extends beyond simply the fee-based revenue that could be calculated from the current assets under management," as a particular client might have eventually decided to use HKFS for additional fee-generating services.  *Id.*  Further, HKFS argues that it cannot know what will happen to the market, or how a lost client's portfolio would have performed "over a lengthy period of time"—factors which would affect HKFS's revenue.  *Id.* According to HKFS, these uncertainties make it impossible to calculate the damages that it will suffer.

But these same uncertainties are present in virtually every case.  A client might choose to do more business over time, or it might choose to do less business.  The economy might improve, or it might deteriorate.  The relevant market might boom, or it might bust.  Businesses can rarely calculate the harm of lost clients or business opportunities with certainty.  "'But damages need not be proved with certainty; it is legally sufficient that a reasonable basis for approximating loss is shown.'"  *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984 (8th Cir. 2008) (quoting *Jensen v. Duluth Area YMCA,*

688 N.W.2d 574, 579 (Minn. Ct. App. 2004)).  The Court has no doubt that there is "a reasonable basis for approximating" the losses suffered by HKFS on account of the three clients following Fulton to Mariner.  And thus, as is true in most cases involving lost clients or lost business opportunities, the harm is reparable, and thus injunctive relief is unwarranted.[12]

Second, as to referral sources:  HKFS argues that while it may be possible to calculate the revenue lost due to departed clients, it would be impossible to calculate the business opportunities lost if one or more of the CPA firms begins referring its clients to Mariner rather than to HKFS.[13]

---

[12]*See, e.g., Gen. Motors Corp.*, 563 F.3d at 319 (affirming lower court's findings "that GM's claim of lost customer relationships was equivalent to a claim of lost profits," and "that any lost sales would amount to a compensable injury"); *Caballo Coal Co. v. Ind. Mich. Power Co.*, 305 F.3d 796, 801 (8th Cir. 2002) (coal producer failed to establish irreparable harm in action alleging breach of long-term coal supply contract, notwithstanding producer's arguments regarding the "uncertainty surrounding future coal prices" and the possible disruption of mining operations); *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (rejecting argument that plaintiff "faces irreparable harm because [defendant] is poised to convert" existing customers, as "any harm [plaintiff] sustains between now and . . . trial will adequately be compensated by an award of damages and permanent injunction." (internal citation and quotation marks omitted)).

[13]*See, e.g., Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 190 (N.D.N.Y. 2005) (finding that the threatened loss of referral sources constitutes irreparable harm, as referral sources are "one step removed" from "the ultimate source of Innoviant's revenue"); *but see Guttenberg v. Emery*, 26 F. Supp. 3d 88, 102 (D.D.C. 2014) (finding no irreparable harm despite plaintiffs' argument that "because their business is based on referrals, lost referrals threaten[] their practice"); *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 966 F. Supp. 540, 543 (E.D. Mich. 1997) ("Should a

(continued...)

There are several problems with HKFS's argument:

First, it is not clear whether the employment agreement prohibits Fulton from soliciting or accepting client referrals from CPA firms that currently refer clients to HKFS.  Fulton agreed "not to solicit Business . . . from any Company client or prospective client, directly or indirectly, for a period of three years[.]"  ECF No. 1-1 ¶ 8(a).  "Business" is defined as "includ[ing] (i) investment advisory business and brokerage of securities . . .; (ii) the sale of any life insurance products . . .; and (iii) financial planning service."  *Id.*  A "Client" is defined as "any . . . entity with whom the Company or any of the Company's soliciting agents or employees have done business within one year prior to [Fulton's] termination."  *Id.*

It is debatable whether, if Fulton made a general pitch to a CPA firm encouraging it to refer clients to Mariner, Fulton would be soliciting "Business" from a "Company Client."  It is not clear whether CPA firms that simply refer clients to HKFS are *themselves* clients of HKFS.  That appears to depend on whether HKFS does "Business" with the CPA firms—and that, in turn, appears to depend on whether HKFS gives advice, sells products, or provides services to the CPA firms themselves.

---

[13](...continued)
determination of damages be required at a latter date, a court could look to [plaintiff's] past performance or . . . the actual dealers which received the referrals in place of [plaintiff].  There is nothing unique about this case, with regard to damages, which would take it out of the ordinary breach of contract remedies context.").

-24-

Fulton's briefing raised this issue only in passing, and HKFS's briefing did not raise this issue at all.  It is HKFS's burden, however, to make a "clear showing" that it is entitled to the "extraordinary remedy" of a preliminary injunction.  *Winter*, 555 U.S. at 22.  Here, HKFS's principal argument in support of finding a threat of irreparable harm centers on conduct that may not even violate the parties' agreement.  Moreover, the employment agreement's lack of clarity on this point substantially undercuts HKFS's characterization of its referral relationships with CPA firms as "the lifeblood" of its business and "a significant (if not the primary) source of HKFS's competitive advantage in the marketplace."  ECF No. 25 at 3–8.  If HKFS's relationship with CPA firms was truly its "lifeblood," one would expect the restrictive covenants in the employment agreement to at least *mention* those firms.  The covenants say nothing—or at least nothing explicit—about these supposedly vital CPA firms.

The second problem with HKFS's argument is that there is no evidence that any CPA firm has actually followed Fulton to Mariner, or that any CPA firm is likely to do so in the future.  The evidence in the record is that Fulton informed a single CPA firm (Erpelding Voigt) that he would be moving from HKFS to Mariner.  *See* ECF No. 27.  But Erpelding Voigt promptly notified HKFS of Fulton's communications and declined to move its business to Mariner.  This suggests that Fulton does not have the type of personal hold over CPA firms—who, after all, are made up of sophisticated professionals who have independent ethical obligations to their clients—that might

-25-

warrant the issuance of a preliminary injunction. *Compare Bos. Sci. Corp. v. Kean*, No. 11-CV-0419 (SRN/FLN), 2011 WL 853644, at *11 (D. Minn. Mar. 9, 2011) (finding that medical device salesperson with "deep sales, technical, and clinical knowledge" and "[l]ong-term customer relationships" developed at former employer's expense had personal hold over clientele sufficient to justify preliminary injunction). At this point, the threatened loss of referrals from CPA firms is too speculative to support the issuance of a preliminary injunction.

Finally, even if a CPA firm that had referred business to HKFS starts referring business to Mariner as a result of Fulton's breach of contract, HKFS will learn of the loss of that business in discovery, and HKFS will likely have "'a reasonable basis for approximating [that] loss'" at trial. *Hinz*, 538 F.3d at 984 (quoting *Jensen*, 688 N.W.2d at 579.[14] Again, certainty is not required; calculating damages almost always involves "some assumptions and inferences." *Email on Acid, LLC v. 250ok, Inc.*, No. 19-CV-3496-WJM-MEH, 2020 WL 364562, at *4–5 (D. Colo. Jan. 22, 2020). As Fulton points out, HKFS likely has data on how much business it has received from a given CPA firm over

---

[14]*See Bison Advisors LLC v. Kessler*, No. 14-CV-3121 (DSD/SER), 2014 WL 5489289, at *3–4 (D. Minn. Oct. 30, 2014) ("Bison argues that its lost profits cannot be reasonably calculated because of the [various complexities of the market]. Defendants respond by setting forth common methods that they allege could be used to calculate damages to a reasonable degree of certainty. In light of this disagreement, the court finds that Bison has not met its burden of showing, at this time, that money damages would be difficult to quantify. As a result, this *Dataphase* factor weighs against injunctive relief." (internal citations omitted)).

time.  *See* ECF No. 32 at 15–16.  And in discovery, HKFS may seek information from

Mariner regarding the amount of business that a given CPA firm has referred to

Mariner.  HKFS should have ample data from which its expert witnesses can reasonably

approximate the harm caused to HKFS by the loss of referrals from a CPA firm.

Finally, as to goodwill:  The Court is not persuaded that HKFS's alleged loss of

goodwill is "truly 'irreparable' in the sense that [it] could not be addressed through

money damages if [HKFS] is successful following a trial on the merits."  *Novus*

*Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013); *see also Rogers Grp., Inc. v.*

*City of Fayetteville*, 629 F.3d 784, 790 (8th Cir. 2010) ("a district court may choose to

require more than a loss of goodwill to demonstrate irreparable harm").  At this stage,

any such harm is too speculative to support the issuance of a preliminary injunction.

### 2.  Contractual Stipulation

HKFS next argues that even if it cannot establish a threat of irreparable harm

based on the threatened loss of clients, referral sources, and goodwill, the Court should

nonetheless find irreparable harm based on the parties' stipulation in the employment

agreement.  Specifically, paragraph 8(d) of the employment agreement states:

> The parties acknowledge and agree that irreparable harm
> would result in the event of a breach or threat of a breach by
> [Fulton] under this Section [8].  Therefore, in such an event,
> and notwithstanding any other provision of this Agreement,
> [HKFS] shall be entitled to a restraining order, order of
> specific performance, or other injunctive relief, without
> showing actual damage and without bond or other security.

ECF No. 1-1 ¶ 8(d).

HKFS argues that this contractual provision conclusively establishes a threat of irreparable harm sufficient to justify the issuance of a preliminary injunction. The Court disagrees. *See, e.g., Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1130 (9th Cir. 2020) (adopting "the accepted rule of" several other circuits in holding "that the terms of a contract alone cannot require a court to grant equitable relief"); *Minn. Vikings Football Stadium, LLC v. Wells Fargo Bank, N.A.*, 193 F. Supp. 3d 1002, 1017 (D. Minn. 2016) ("a contractual irreparable-harm provision does not bind the Court, and, without more, is insufficient to establish irreparable injury" (collecting cases)).[15] While the contractual provision may provide some evidence of irreparable harm, the parties' stipulation is not

---

[15]*See also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) ("Although [the parties] agreed that any breach of the Agreement would constitute irreparable harm and would warrant an award of injunctive relief, that stipulation without more is insufficient to support an irreparable harm finding."); *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop."); *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d. Cir. 1987) (per curiam) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"); *see also see also* Restatement (Second) of Contracts § 359 cmt. a (Am. Law. Inst. 1981) ("Because the availability of equitable relief was historically viewed as a matter of jurisdiction, the parties cannot vary by agreement the requirement of inadequacy of damages, although a court may take appropriate notice of facts recited in their contract."); *but cf. Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1422 (N.D. Iowa 1996) (declining to decide whether contractual provision stipulating to irreparable harm was binding because the record contained sufficient evidence of irreparable harm).

binding on the Court and is not conclusive in the absence of actual evidence of

irreparable harm.[16]

### 3.  Inference of Irreparable Harm

Finally, HKFS argues that under Minnesota law, it is entitled to an "inference" of

irreparable harm upon breach of a valid restrictive covenant.[17]  *See D.L. Ricci Corp. v.*

*Forsman*, No. C8-97-1597, 1998 WL 202595, at *4 (Minn. Ct. App. Apr. 28, 1998).  But

whether a party has shown irreparable harm is controlled by federal law, not state

law.[18]  Moreover, even if Minnesota common law applied to the Court's analysis of the

---

[16]HKFS argues that because the employment agreement is governed by Iowa law, and because Iowa courts have found these types of contractual provisions to be binding, this Court is required to find irreparable harm based on the contract language.  But the Court's authority to issue a preliminary injunction is governed by federal law, not Iowa law.  *See Modern Comput. Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 n.5 (8th Cir. 1989) (en banc) (superseded by statute on other grounds); *Tri-State Grease & Tallow Co. v. Milk Specialties Co.*, No. 11-CV-0709 (RHK/JSM), 2011 WL 1561674, at *6 (D. Minn. Apr. 22, 2011) ("in diversity cases such as this, whether to grant a preliminary injunction is determined using federal rather than state standards"); *Viad Corp. v. Cordial*, 299 F. Supp. 2d 466, 481 (W.D. Pa. 2003) ("although the enforceability of a restrictive employment covenant is governed by Pennsylvania substantive law, federal law governs the standards for injunctive relief, including the irreparable harm requirement").

[17]The Court notes that this argument is at odds with HKFS's contention—made in connection with the contractual stipulation regarding irreparable harm—that *Iowa* law controls the irreparable-harm inquiry.

[18]*See Tri-State Grease & Tallow Co.*, 2011 WL 1561674, at *6 (rejecting plaintiff's argument that the court must apply Illinois case law providing that the risk of losing customers constitutes irreparable harm, because "whether to grant a preliminary injunction is determined using federal rather than state standards"); *see also Am. Mortg.*

(continued...)

-29-

irreparable-harm factor, the inference is rebutted in this case by the Court's finding that the threatened harm is reparable with money damages, too speculative to support a preliminary injunction, or both. *See Matson Logistics, LLC v. Smiens*, No. 12-CV-0400 (ADM/JJK), 2012 WL 2005607, at *14 (D. Minn. June 5, 2012) (inference of irreparable harm rebutted by, among other things, the fact that "monetary damages can be adequately calculated"); *St. Jude Med. Inc. v. Carter*, 913 N.W.2d 678, 685 (Minn. 2018) (finding that "any inference of irreparable harm . . . was rebutted" by the "speculative" nature of plaintiff's fear that former employee would disclose business secrets).

---

[18](...continued)
*& Equity Consultants, Inc. v. Everett Fin., Inc.*, No. 20-CV-0426 (ECT/KMM), 2020 WL 968354, at *5 (D. Minn. Feb. 28, 2020) (questioning validity of the common-law doctrine).

Although courts in this District regularly cite this Minnesota common-law doctrine in ruling on preliminary-injunction motions, the Court is aware of only three instances in which the Eighth Circuit has addressed the doctrine, and no instance in which the Eighth Circuit has conclusively held that its application by federal courts considering motions under Fed. R. Civ. P. 65(a) is appropriate. In *Overholt Crop Insurance Services Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) the court applied the doctrine in the context of a permanent, rather than preliminary injunction. In *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 569 (8th Cir. 1982), after the defendant argued on appeal that the district court had abused its discretion in inferring irreparable harm, the Eighth Circuit declined to address the issue and instead affirmed because the district court had not relied solely on the inference, but had also considered other evidence sufficient to support a finding of irreparable harm. And finally, in *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894–95 (8th Cir. 2013), the plaintiff argued that the lower court abused its discretion in declining to infer irreparable harm. The Eighth Circuit again bypassed the issue, stating that "[a]fter considering all of the arguments made by both parties," the court found that the denial of the preliminary injunction was not an abuse of discretion in light of (1) the plaintiff's delay in seeking a preliminary injunction, and (2) the lack of evidence that the alleged harm was "truly irreparable." *Id.* at 895.

### D.  Balance of Harms and Public Interest

In determining whether a preliminary injunction should issue, courts are

directed to balance the threat of irreparable harm to the movant against the injury that

granting the injunction will inflict on the other litigants.  *Dataphase Sys.*, 640 F.2d at 113.

Here, however, HKFS does not face a threat of irreparable harm.  If HKFS has been

damaged by Fulton and Mariner, HKFS will have an opportunity to prove and recover

those damages at trial.  HKFS has not argued that Fulton's actions threaten its ongoing

viability as a financial-services firm, and the evidence in the record would not support

such a claim.  Three client accounts totaling approximately $4.3 million in assets under

management have moved from HKFS to Mariner.  This represents a tiny fraction—just

over one tenth of one percent—of the more than $4 billion in assets that HKFS currently

manages.[19]  *See* ECF No. 26 ¶¶ 3, 15.  The harm that issuing a preliminary injunction

would inflict on Fulton, by contrast, is potentially significant.  HKFS seeks to put Fulton

out of work for the pendency of this litigation, threatening his livelihood and depriving

Mariner of Fulton's services.  The Court therefore finds that the balance of harms cuts

against issuing a preliminary injunction.

---

[19]*See Caballo Coal Co.*, 305 F.3d at 798 (declining to grant preliminary injunction in action for breach of long-term coal supply contract where dispute involved "less than 5% of the parent companies' annual Powder River Basin coal production and an even smaller percentage of their total annual coal production").

HKFS argues that the public interest favors issuing a preliminary injunction because the public has an interest in the enforcement of valid contracts. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) ("if these noncompete agreements are valid, the public interest calls for their enforcement").  But given that HKFS's alleged injuries are compensable with money damages, the public's interest in the enforcement of valid contracts will be fully vindicated at trial, where Fulton and Mariner will be required to fully compensate HKFS for any harm the firm has suffered as a result of a breach of a valid contractual provision.  The public interest does not require issuance of a preliminary injunction at this time.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendant/counter-claimant/cross-claimant Honkamp Krueger Financial Services Inc.'s motions for preliminary injunctions [ECF Nos. 23, 49] are DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 1, 2020                                  s/Patrick J. Schiltz                              
                                                         Patrick J. Schiltz
                                                         United States District Judge